1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTERA TAMAS, et al.,

              Plaintiffs,

     v.

STATE OF WASHINGTON, et al.,

              Defendants.

CASE NO. C07-750RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on Plaintiffs' motions to strike Defendants' affirmative defenses (Dkt. ## 27 and 78) and Defendants' motion for summary judgment (Dkt. # 36). Neither party has requested oral argument on any motion, and the court finds the motions suitable for disposition on the basis of the parties' briefing and supporting evidence. For the reasons explained below, the court GRANTS IN PART and DENIES IN PART Plaintiffs' first motion (Dkt. # 27), DENIES Plaintiffs' second motion (Dkt. # 78), and DENIES Defendants' motion (Dkt. # 36).

ORDER – 1

# II. BACKGROUND[1]

This case arises from approximately 30 complaints and other information that Washington's Department of Social and Health Services ("DSHS") received over a nearly 10-year period, alleging that Enrique Fabregas was physically and sexually abusing, neglecting, and exploiting his foster children, Plaintiffs Monica, Ruth Tamas, and Estera Tamas.[2] The Plaintiffs have claimed, *inter alia*, that DSHS social workers knew or suspected Fabregas was abusive, but failed to protect Plaintiffs from harm in his home.

## A. Plaintiff Monica is Placed With Fabregas.

In 1996, 2-year-old Monica was living with her mother, Angelique Moore, and Moore's boyfriend, Fabregas. On July 19, 1996, DSHS received a complaint that Fabregas was physically abusing Moore. DSHS filed a dependency petition related to Monica four days later. The petition notes that at the time the police responded to the July 19 complaint, Moore was intoxicated and Fabregas had fresh tracks in his arms from drug injections. The dependency court ordered supervised visits between Monica and Moore and Fabregas conditioned on Moore and Fabregas being clean and sober. Erwin Decl., Ex. C at 3.

Fabregas filed a motion to intervene as a party in Monica's dependency action. DSHS and Monica's guardian ad litem objected on the grounds of Fabregas's criminal history (which includes convictions for, *inter alia*, drug possession, disorderly conduct, forgery, theft, and assault) and drug use. The court ordered that Fabregas be given notice

---

[1]The facts in this case are voluminous. This order does not attempt to summarize all of them, but only those facts primary to the court's consideration of the motions resolved by this order. Specific facts related to each individual Defendant will be addressed in other sections of this Order. *See supra*, Section III.1.b.

[2]The parties' briefs do not reveal Monica's last name, and the court will refer to all Plaintiffs by their first names for ease of reference. Monica was born December 29, 1993; Ruth was born May 8, 1988; Estera was born December 18, 1985.

ORDER – 2

of any "placement, permanency plans, and disposition" with regard to Monica.  Erwin

Decl., Ex. G.

While Monica was in foster care, the foster parent who supervised Monica's visits

with Fabregas wrote to inform the court that Fabregas had showed her a videotape he had

made, containing scenes of Monica stuffed in a freezer and a washing machine, and

standing at the side of a heavily trafficked road.  *See* Erwin Decl., Ex. K at 7.  DSHS also

informed the court that Fabregas had started using cocaine again after a long period of

abstinence, and was in treatment.

In February 1997, the court returned 3-year-old Monica to Moore's home and

ordered supervised visits with Fabregas.  In July 1997, a DSHS social worker, Defendant

Chris Kneser, received a report of Fabregas's child abuse and neglect from the agency

that supervised Monica's visits with Fabregas.  *See* Moody Decl. (Dkt. # 28), Ex. 5.[3]

Monica told a staffer at the agency that Fabregas touched her in a bad way.  *Id*.  Kneser

suspended Monica's visits with Fabregas pending Child Protective Services' ("CPS")

---

[3]In their summary judgment motion, Defendants moved to strike portions of the
submissions Plaintiffs attached to their motions.  *See* Defs.' Mot. (Dkt. # 36) at 26-28.
Defendants claim that the documents attached to David Moody's declaration are inadequately
authenticated because they were obtained through public disclosure requests and are not certified
public documents or authenticated by someone with personal knowledge of those documents.
Defendants do not address Federal Rules of Evidence ("FRE") 901(a), which provides that "[t]he
requirement of authentication or identification as a condition precedent to admissibility is satisfied
by evidence sufficient to support a finding that a matter in question is what its proponent claims."
The FRE also refer to public documents as an example of the type of document that can be
authenticated by evidence that the document is from the public office where items of this nature
are kept.  *See* Fed. R. Evid. 901(b)(7).  Because Plaintiffs have submitted declarations stating that
the documents attached to the Moody declaration were obtained through public disclosure
requests, and the Defendants have provided this court with no reason to believe the documents
are not authentic, Defendants' motion to strike documents attached to the Moody declaration is
DENIED.
Defendants also moved to strike certain paragraphs of Jennifer Baldwin's declaration
(Dkt. # 29) and Jane Ramon's entire declaration (Dkt. # 30).  For purposes of resolving these
motions, the court has not relied on any inadmissible evidence included in or attached to the
Baldwin or Ramon declarations, so Defendants' motion to strike is DENIED as moot.

ORDER – 3

investigation.  The CPS investigator assigned to the case ultimately determined that the allegation was inconclusive because Monica denied the abuse when asked about it later, Moore did not believe Fabregas had abused Monica, and Fabregas denied the abuse.  *See* Kneser Decl., Ex. A.

In August 1997, Moore moved for an order placing Monica with friends because she had relapsed in her substance abuse plan, and the court granted the motion.  Erwin Decl., Ex. O.  In November, Fabregas applied for a foster-parent license and, as part of his application, declared that he had never been convicted of a crime.  In February 1998, Fabregas filed a motion requesting that Monica be placed in his home.  The court ordered that it was in Monica's best interests for her to be placed with Fabregas by March 31, 1998, on the condition that he obtain a foster-care license and comply with the DSHS service plan.  Erwin Decl., Ex. S.

**B.      Fabregas Receives a Foster-Care License.**

Though Fabregas claimed in his foster-care license application that he had never been convicted of a felony, a DSHS criminal history check revealed that this was not true. *Compare* Moody Decl., Ex. 7 (the criminal history inquiry), *with id*., Ex. 8 (Fabregas's criminal history).  Fabregas's criminal history precluded his licensure as a foster parent. *See* Kleinhen Decl. ¶ 5.  Fabregas filed a motion for a certificate of rehabilitation, which would allow him to be licensed despite his criminal history.  Erwin Decl., Ex. U.  The court granted Fabregas's motion and ordered a certificate of rehabilitation.  Erwin Decl., Ex V.  Two days later, before Fabregas's licensing application had been approved, the court entered a permanency planning order, specifying placement with Fabregas.  Erwin Decl., Ex. W.

After Monica was placed with Fabregas, Defendant Sharon Kleinhen, a DSHS foster home licensor, recommended to her supervisor (Defendant Joyce Drake) that Fabregas be licensed.  Kleinhen Decl. ¶ 7.  Drake and her superiors reviewed the

application and approved it on May 15, 1998.  Fabregas moved in 1999, and Defendant Sharon Loeffler was the DSHS foster-home licensor assigned to Fabregas in his new location.  After reviewing Fabregas's entire DSHS file, Loeffler recommended that Fabregas's licensing application be approved.  Defendant Drake, as Loeffler's supervisor, signed the license.  Loeffler Decl., Ex. A.

**C.    Fabregas Adopts Monica, but DSHS Continues to Receive Complaints.**

Fabregas formally adopted Monica in early 2000.  In June 2000, a counselor at Monica's school complained to DSHS that 6-year-old Monica had been soiling her pants at school and had reported that Fabregas was using and dealing drugs.  Moody Decl., Ex. 17.  The caseworker did not investigate the complaint, believing that the allegations did not meet the criteria for investigation, and closed the complaint because "there was no allegation about Mr. Fabregas."  Walker Decl. ¶ 12.  In September 2000, DSHS received an anonymous complaint alleging that Fabregas was dealing drugs and would spend nights out with 13-year-old Estera, the daughter of Fabregas's girlfriend, dressed like "a hooker," while Monica was left home alone until 5 a.m.  Moody Decl., Ex. 18.  The caseworker listed these allegations as unfounded, and closed the referral "as there was no allegation about Mr. Fabregas."  *Id*.

In March 2001, a witness filed a CPS complaint, claiming she had seen Fabregas holding and kissing Monica as if she were a "girlfriend or lover" at a McDonald's restaurant.  Moody Decl., Ex. 19.  The caseworker did not investigate the complaint because the allegations did not meet the criteria for investigation, and closed the complaint because "there was no allegation about Mr. Fabregas."  *Id*.

That same month, DSHS received another CPS complaint from Monica's school principal, alleging that Monica told a school employee that Fabregas had bitten her face and that other staff members had witnessed Fabregas being "all over" Monica when he picked her up at school.  Moody Decl., Ex. 20.  Monica was interviewed and denied the

allegations, describing a bruise as the result of playful wrestling. By the time the social worker interviewed Monica, no bruise was visible. The social worker closed the referral, concluding the allegations were unfounded. Payne Decl., Ex. E & F.[4]

**D.    The Court Orders Plaintiffs Ruth and Estera to be Placed With Fabregas.**

In early 2001, DSHS filed dependency petitions for 15-year-old Estera and 12-year-old Ruth, daughters of Fabregas's girlfriend. At that time, Estera and Ruth had been living with Fabregas while their mother dated Fabregas and baby-sat Monica. Estera and Ruth were represented by independent counsel during their dependency proceedings and requested placement with Fabregas. The DSHS social worker objected to placing Estera and Ruth with Fabregas due to his criminal background and the volume of CPS complaints about him. Lipson Decl., Ex. A. The court requested more information on Estera and Ruth's request to live with Fabregas, and Defendant Elaine Lipson performed a follow-up investigation. Lipson filed declarations outlining the steps she had taken to investigate Fabregas, and Estera and Ruth also provided statements about their desire to live with Fabregas. Erwin Decl., Exs. II & JJ. Based on her follow-up investigation, Lipson informed the court that she believed Fabregas was a stable man of good character. In July 2001, the court ordered Estera and Ruth to be placed with Fabregas.

**E.    DSHS Re-Licenses Fabregas as a Foster Parent.**

At the time Estera and Ruth were placed with Fabregas, he was no longer licensed as a foster parent because he had adopted Monica. Defendant Kellie Walker processed Fabregas's application to be relicensed. Walker interviewed Estera and Ruth individually, and neither girl reported any problems with the placement. Walker

---

[4]Plaintiffs moved to strike Defendant Payne's declaration (attached to Defendants' summary judgment motion), alleging that it contains inadmissible hearsay. *See* Pltfs.' Opp'n (Dkt. # 58) at 21-23. Plaintiffs allege that the portions of Payne's declarations that describe Baker's actions and relate statements made by law enforcement personnel are inadmissible hearsay or double hearsay. The court has not relied on the disputed portions of Payne's declarations for purposes of this order, so this motion is DENIED as moot.

ORDER – 6

reviewed Fabregas's entire file, including a new criminal history report and his certificate of rehabilitation from 1998. She discovered that Fabregas had been arrested for domestic violence in 2002, but was never charged. *See* Walker Decl., Ex. B. Fabregas again requested an exception based on his criminal history. Walker processed this request, and the exception was approved. *Id.*

DSHS received two CPS complaints while Walker was evaluating Fabregas's foster license. In an October 2001 complaint, a foster parent of Ruth's sister reported that Ruth had bruises from a fight with Monica and that Ruth was punished for defending herself. *See* Moody Decl., Ex. 24. Fabregas was not accused of any abuse in this complaint, so Walker believed it did not prevent Fabregas's licensure. Walker Decl. ¶ 11. A January 2002 CPS complaint stated that Fabregas was buying cigarettes and alcohol for Estera and Ruth. Moody Decl., Ex. 26. Walker and other CPS officials investigated, and Fabregas denied the allegation. Walker Decl. ¶ 13. Fabregas signed a compliance agreement promising to keep any alcohol in the house locked up at all times. Walker Decl., Ex. K. After making numerous visits to the home, Walker completed a foster family assessment in March 2002 and recommended that Fabregas's application be approved. He was relicensed in April 2002.

**F.      Ruth Expresses Concerns About the Fabregas Placement.**

During the months Ruth and Estera were living with Fabregas and his license was being investigated, Ruth reported to Lipson that she did not want to live with Fabregas any longer because he favored Monica. Lipson did not remove Ruth, but interviewed her and Estera. Estera said she wanted to continue living with Fabregas.

Ruth and Estera's mother agreed that her children should be removed from Fabregas's home, but Ruth and Estera's lawyers asked the court to order continued placement with Fabregas. In October 2001, the court ordered that neither Ruth or Estera

be moved without their approval, "absent allegations of abuse/emergency." Erwin Decl., Ex. SS.

In January 2002, Ruth and Estera's mother filed a motion to remove the girls from Fabregas's home. Erwin Decl., Ex. VV. She alleged Fabregas was physically abusing them and that he was brainwashing them. Estera and Ruth opposed this motion and filed letters expressing their desire to stay with Fabregas. In July 2002, Estera and Ruth's mother filed another motion challenging the Fabregas placement, alleging he was using drugs, that he had been physically abusive, and that the positive letters attributed to Estera were really written by Fabregas. Also during that month, a foster parent of Estera and Ruth's sister reported to CPS that Fabregas hit Estera's head against a wall and slapped Ruth across the face. Moody Decl., Ex. 28. Each independently denied their own abuse and abuse of the other, and Fabregas also denied the allegations. Payne Decl., Ex. J & K. Payne closed the referral as unfounded.

In September 2002, Ruth and Estera's sister's foster mother reported to CPS that Ruth and Estera had been caught shoplifting and that Fabregas had encouraged them to do it. Moody Decl., Ex. 30. Payne closed the referral because there was no allegation of abuse related to Fabregas.

## G. DSHS Receives More Complaints Regarding Fabregas's Abuse of Monica.

In November 2003, one of Monica's school counselors filed a CPS complaint, alleging that Monica disclosed that Fabregas slept in the same bed with her and "bumps into her in bed" at night. The next month, Fabregas's nanny filed a CPS complaint alleging that Fabregas possessed pornographic photographs involving Monica. Defendant Beverly Payne reviewed the investigation of these complaints. CPS investigators determined that the allegations were unfounded because Fabregas denied inappropriate touching, the photographs discovered did not involve a child, and Monica denied abuse. Payne Decl., Exs. O & P.

ORDER – 8

In April 2004, DSHS received a CPS referral alleging that Monica had multiple bruises and gave conflicting reports on how she had been bruised. The referral was assigned for investigation and also forwarded to the Kirkland Police Department. The DSHS investigator interviewed Monica, the referent, and school personnel. The investigator consulted with a medical expert in child abuse injuries, and he stated he could not determine that Monica's bruises were a result of abuse. The CPS report also notes that Monica's mother had spent a period of time living with Monica at Fabregas's home, implying that she could have been responsible for the abuse. The referral was ultimately closed as unfounded, yet the report noted that the allegation suggested a "moderately high" risk of future abuse to Monica. Payne Decl., Ex. Q & R.

**H.** **Ruth Alleges that Fabregas Physically Abused Her and is Sexually Abusing Estera.**

In May 2004, Ruth requested to be moved into the foster home of another one of her sisters, and Defendant James Kairoff, the social worker assigned to Ruth and Estera's dependency cases, removed her. Later that month, Ruth told a counselor that Fabregas had physically abused her, and the counselor reported those allegations to CPS. Ruth also alleged that she had videotaped Fabregas and Estera engaging in sexual contact, but that she had destroyed the tape. These complaints were referred to Defendant Marschell Baker, a CPS complaint investigator.

Kairoff met with Estera for a safety assessment in light of Ruth's allegations. According to an update to the CPS complaint regarding Ruth's allegations, Estera asked to be removed from Fabregas's home, but Kairoff "talked her out of that request." Moody Decl., Ex. 43. According to Kairoff, Estera denied sexual contact with Fabregas, and Kairoff did not find any corroborating physical evidence. Kairoff Decl. ¶ 11.

Baker eventually closed the investigation of the CPS complaint regarding Estera because Estera denied the allegations of abuse, Ruth admitted to destroying the videotape showing sexual contact between Estera and Fabregas, Monica denied that Estera spent

ORDER – 9

time in Fabregas's room, and the Kirkland Police Department had closed their investigation.  Baker Decl. ¶ 17.[5]  Baker also closed the complaint regarding Ruth because there was no physical evidence of abuse (due to the delay between the alleged abuse and Ruth's disclosure).  *Id.*

## I.    DSHS Removes Estera and Monica from Fabregas's Home.

On July 29, 2004, DSHS received three separate complaints that Fabregas had sexually abused and threatened Estera.  That day, Estera and Monica were removed from Fabregas's home.  On August 3, DSHS received a complaint that when Kirkland Police Department officers arrived to remove Estera on July 29, Fabregas was snorting cocaine with her in his bedroom.

Baker interviewed Estera in August 2004.  Estera admitted that Fabregas abused alcohol and was physically abusive to her, and that she had used cocaine while living with him.  She told Baker that everything her sisters had said in the past was true.  Fabregas denied all allegations.

## J.    DSHS Returns Monica to Fabregas's Home.

Monica was returned to Fabregas's home in mid-August because DSHS social workers believed that it did not have enough information to believe the allegations against Fabregas.  *See* Erwin Decl., Ex. AA.

Baker and Payne interviewed Fabregas in September 2004, and Fabregas denied all allegations.  In November 2004, Estera sent a letter to Baker recanting all the

---

[5]Plaintiffs moved to strike Payne's second declaration and Baker's declaration, alleging that it is improper to attach new evidence to a reply brief and that the declarations contain inadmissible hearsay.  *See* Pltfs.' Mot. (Dkt. # 67).  Though Plaintiffs generally allege that it is prejudicial to introduce new evidence in a reply brief, they have not shown that they have been prejudiced by the submission of declarations in this case.  To the extent that the declarations include inadmissible hearsay, the court has not relied on those portions in consideration of the motions resolved in this order.  Plaintiffs' motion to strike (Dkt. # 67) is therefore DENIED as moot.

ORDER – 10

allegations she had made against Fabregas. She claimed that one of her other foster parents manipulated her to accuse Fabregas of abuse so that Ruth would not appear to be a liar. Baker closed the CPS investigations into the referrals in October 2005. She completed an assessment stating that the allegations against Fabregas were inconclusive. Baker Decl. at 11.

On February 2, 2006, DSHS received a complaint alleging that Monica was sleeping in the same bed with Fabregas and had rashes on her legs and genitalia, and that Fabregas was providing illegal drugs to Monica and other minors. Moody Decl., Ex. 54. Two weeks later, the Redmond Police Department executed a search warrant at Fabregas's home. Monica was transferred to a foster home. Fabregas was arrested and charged with multiple charges of sex crimes against children.

In April 2007, Estera, Ruth, and Monica filed a complaint against DSHS and nine social workers, alleging claims of negligence and civil rights violations under 42 U.S.C. § 1983. Defendants removed the case to federal court.

### III. DISCUSSION

Plaintiffs move to strike all of Defendants' eight affirmative defenses as legally insufficient. *See* Pltfs.' Mots. (Dkt. # 27, 78). In their response, Defendants moved for summary judgment against the Section 1983 claims on the basis of failure to state a claim and immunity. *See* Defs.' Mot. (Dkt. # 36). This order will address the immunity issues before addressing Plaintiffs' motions to strike.

**A.    The Court Denies Defendants' Motion for Summary Judgment.**

**1.    Legal Standards on a Summary Judgment Motion**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial

ORDER – 11

burden of demonstrating the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this initial burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue exists for trial. Fed. R. Civ. P. 56(e); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). When considering a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

> **2.      The Individual Defendants are Not Entitled to Immunity.**

> **a.      Absolute Immunity Does Not Apply to the Discretionary Decisions That Form the Basis of Plaintiffs' Section 1983 Claims**.

Defendants contend that the individual Defendants are entitled to absolute immunity for their execution of quasi-judicial and quasi-prosecutorial functions.

Social workers are absolutely immune from suits based on their quasi-judicial actions, such as the execution of a court order in the context of a child welfare proceeding. *See Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir. 1991); *Coverdell v. Dept. of Soc. & Health Servs.*, 834 F.2d 758 (9th Cir. 1987). Social workers also enjoy absolute immunity for their quasi-prosecutorial actions, which include instances where a social worker advocates before an impartial decisionmaker. *See Caldwell*, 928 F.2d at 333. Quasi-prosecutorial immunity also shields social workers from suits based on their initiation of dependency proceedings. *See Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003). The scope of absolute immunity for social workers is "extremely narrow," and applies only to functions historically recognized as absolutely immune at common law. *Id*. at 897-898. While the role of a social worker does include some quasi-judicial or quasi-prosecutorial functions,

> [t]o the extent [] that social workers also make discretionary decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions, only qualified, not absolute immunity, is available. Examples of such functions may include decisions and recommendations as

ORDER – 12

to the particular home where a child is to go or as to the particular foster parents who are to provide care.

*Id*. at 898. The official claiming absolute immunity for a particular function has the burden to show that the function has a common-law counterpart that is absolutely immune. *Id*. at 897.

Though the individual Defendants may in fact perform quasi-judicial or quasi-prosecutorial functions, the Plaintiffs' Section 1983 claims are not based on the quasi-judicial or quasi-prosecutorial actions. Plaintiffs' Section 1983 claims are based on Defendants' discretionary decisions and recommendations regarding Plaintiffs' placement with Fabregas and Fabregas's licensure as a foster parent, functions that the Defendants have not shown are similar to a judicial or prosecutorial functions and which the *Miller* court suggested would be subject to qualified immunity. *See id*. at 898. Therefore, absolute immunity does not apply here.

### b. The Individual Defendants are Not Entitled to Qualified Immunity.

#### 1) The Legal Standards on Qualified Immunity.

A plaintiff may bring a claim under Section 1983 to redress violations of his or her "rights, privileges, or immunities secured by the Constitution or [federal] laws" by a person acting under the color of state law. 42 U.S.C. § 1983; *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). Plaintiffs have brought Section 1983 claims against the individual Defendants, contending that they violated Plaintiffs' constitutional right to personal safety. The individual Defendants contend that they are not liable under Section 1983 because of qualified immunity, a defense that allows only violations of "clearly established" federal rights to result in Section 1983 liability. The parties have not framed the qualified immunity question before the court as a question involving disputed facts; the dispute for purposes of this motion is whether the Plaintiffs' alleged federal rights exist and whether the individual Defendants violated those rights.

ORDER – 13

In considering whether a defendant is entitled to qualified immunity at the summary judgment stage, a district court must first consider whether, viewing the facts in the light most favorable to the party alleging injury, the facts alleged show that the defendant's conduct violated a federal right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If so, then the district court must next determine whether the right was clearly established, such that a reasonable person in the defendant's position would have known that his or her conduct violated the law. *Id*. at 202.

### 2) Plaintiffs Have Alleged the Violation of a Federal Right.

Plaintiffs claim that they had a constitutional right, as foster children, to protection from a foster parent known or suspected to be an abuser.[6] Plaintiffs claim that this right is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, citing *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982); *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990); *Yvonne L. v. New Mexico Dept. of Human Servs.*, 959 F.2d 883, 891-92 (10th Cir. 1992).

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The Due Process Clause has procedural and substantive spheres, such that substantive due process bars "certain government actions regardless of the fairness of the procedures used to implement them."

---

[6]The Plaintiffs also allege that the individual Defendants' failure to follow state law regarding the reporting of child abuse allegations forms the basis of their Section 1983 claims. *See* Pltfs.' Resp. (Dkt. # 58) at 3. An allegation that a defendant violated state law generally does not support Section 1983 liability because Section 1983, "by its own terms, protects only against violations of federal law." *Hydrick v. Hunter*, 500 F.3d 978, 987 (9th Cir. 2007). Plaintiffs have not shown how the individual Defendants' alleged violations of RCW 26.44.030(4) violated *federal* law for purposes of Section 1983. Therefore, this order considers whether Plaintiffs' other allegations support Section 1983 liability.

ORDER – 14

*Daniels v. Williams*, 474 U.S. 327, 331 (1990). When a government arbitrarily deprives an individual of a liberty interest, the individual's substantive due process right is violated. *See Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). A plaintiff alleging a substantive due process violation must "first show a deprivation of some fundamental right or liberty interest that is 'deeply rooted in this Nation's history and tradition.'" *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055, 1061 (9th Cir. 2006) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). The plaintiff must also show that the state actor's conduct shocks the conscience, because "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). To establish that a state actor's conduct was sufficiently egregious, a plaintiff must show that the defendant acted with, at a minimum, deliberate indifference to the plaintiff's rights. *Lewis*, 523 U.S. at 846-53. A court may infer the state actor's "subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

In *Youngberg*, the Supreme Court held that mentally retarded persons committed against their will to state institutions have a liberty interest in personal safety that is protected by substantive due process. 457 U.S. at 315-16. The Supreme Court addressed this right again in *DeShaney*, explaining that all those in state custody have a substantive due process liberty interest in personal safety, and questioning in dicta whether the state could be liable under the Due Process Clause for "failing to protect children in foster homes from mistreatment at the hands of their foster parents." *See* 489 U.S. at 201 n.9 (noting that the Second Circuit (*Doe*, 649 F.2d at 141-42) and Eleventh Circuit (in *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 794-797 (11th Cir. 1987)) had analogized *Youngberg* in a foster-care context). Though the court is not aware of any binding Ninth

ORDER – 15

Circuit authority[7] addressing the liability of social workers who fail to protect children from harm inflicted by foster parents, the court may look to the law of other circuits to determine whether the constitutional right exists. *See Hydrick v. Hunter*, 500 F.3d 978, 989 (9th Cir. 2007) (citing *Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005) (stating that the law of other circuits can be considered to determine whether a constitutional right exists)).

As mentioned above, in 1981, the Second Circuit held that a child in state custody has a Due Process right not to be placed with a foster parent known to be abusive. *See Doe*, 649 F.2d at 141. The Tenth Circuit found that, by 1985, it was clearly established under *Youngberg* and *Doe* that "children in the custody of a state had a constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs." *Yvonne L.*, 959 F.2d at 893. In 1987, the Eleventh Circuit recognized that the Due Process Clause protects a foster child's right to physical safety. *See Taylor*, 818 F.2d at 795. In 1990, the Seventh Circuit held that a foster child has a right not to be placed with a foster parent whom state caseworkers know or suspect is likely to abuse or neglect the child. *See K.H.*, 914 F.2d at 853.

Based on this review of the law, the court is persuaded that the Plaintiffs' liberty interest in personal safety includes the right to protection from harm inflicted by a foster parent known or suspected to be abusive. The court must now consider whether the facts alleged show that the individual Defendants were deliberately indifferent to Plaintiffs' right to personal safety.

---

[7]Two other district courts in the Ninth Circuit have also applied *DeShaney* and related cases from other circuits to conclude that, in the context of resolving motions to dismiss, plaintiffs had alleged valid Section 1983 claims based on a social worker's deliberate indifference to a foster child's right to protection from harm inflicted by a foster parent known or suspected to be abusive. *See Mix v. Jones-Johnson*, 2006 WL 262 1071 (D. Nev. Sept. 8, 2006); *Garcia v. Gonzalez*, 2006 WL 3457227 (E.D. Cal. Nov. 30, 2006).

ORDER – 16

### 3) Viewing the Evidence in the Light Most Favorable to the Plaintiffs, Each Individual Defendant was Deliberately Indifferent to the Rights of Plaintiff(s).

#### (a) Kneser Violated Plaintiff(s)' Rights.

While Defendant Kneser was Monica's caseworker from June 1997 to February 1999, she was aware of numerous CPS complaints against Fabregas, including the report of the video Fabregas had filmed containing scenes of 2-year-old Monica stuffed in a freezer and a washing machine, and standing at the side of a heavily trafficked road, and the report that Monica had disclosed that Fabregas was sexually abusing her. Kneser's declaration emphasizes that it was the court order that placed Monica with Fabregas with knowledge of these complaints (in addition to other information received about Fabregas's criminal history and drug use), *see* Kneser Decl. ¶ 18, but the court's role in the placement process did not usurp Kneser's professional responsibilities to take appropriate steps to protect Monica from harm while she was in state custody. A reasonable person in Kneser's position would have suspected that Fabregas posed a threat to Monica's safety. Viewing the evidence in the light most favorable to the Plaintiffs, Kneser was deliberately indifferent to Monica's rights.

#### (b) Kleinhen Violated Plaintiff(s)' Rights.

Defendant Kleinhen was assigned to review Fabregas's first request for a foster home license in 1997. Kleinhen Decl. ¶ 3. She reviewed Fabregas's entire DSHS file, and had numerous concerns about his background and the inconclusive CPS complaint against him, which alleged that Fabregas was sexually abusing Monica. *Id*. ¶¶ 5, 7. She decided that she would recommend that Fabregas be licensed despite these concerns, after considering that the court had found his home to be an appropriate placement for Monica "with full knowledge of his criminal history, odd parenting methods, a drug and rehabilitation past, and concerns about sexual deviance [that] had been raised and ruled out by a psychological evaluation." *Id.* ¶ 7. Fabregas's foster-license application stated

ORDER – 17

he had never been convicted of a felony, but Kleinhen knew that this was untrue. *Id*., Ex. A. The fact that the court conditioned Monica's placement with Fabregas on his licensure did not usurp Kleinhen's responsibility to exercise her professional discretion to evaluate whether Fabregas should be licensed. A reasonable person in Kleinhen's position would have suspected that Fabregas posed a threat to Monica's safety. Viewing the evidence in the light most favorable to Plaintiffs, Kleinhen was deliberately indifferent to Monica's rights.

### (c) Drake, Walker, and Loeffler Violated Plaintiff(s)' Rights.

Defendant Drake supervised the licensors who licensed and monitored foster homes from 1997 until 2002. Drake Decl. ¶ 3. While Drake was a supervisor, multiple licensing complaints were filed with DSHS, alleging Fabregas's physical abuse and possible exploitation of Plaintiffs. *See* Payne Decl. ¶¶ 10-11. Defendants Loeffler and Walker, as licensors, reviewed Fabregas's entire file and recommended that he be licensed as a foster parent in 1998, 1999, and 2002, despite the fact that numerous CPS complaints were filed during this period.[8] Multiple licensing complaints DSHS received during this time period alleged that Fabregas was abusing and/or neglecting Plaintiff(s), but the complaints were not investigated because Fabregas was not licensed at the time the complaint was filed. Licensors then closed the complaints and re-licensed Fabregas. *See*, *e.g.*, Second Moody Decl. (Dkt. # 54), Ex. 60. The number and seriousness of the complaints against Fabregas would have alerted a reasonable person in the position of these Defendants that Fabregas posed a threat to Plaintiff(s)' safety. Viewing the evidence in the light most favorable to Plaintiffs, Drake, Loeffler, and Walker were deliberately indifferent to Plaintiffs' rights.

---

[8] Plaintiffs' briefing includes a timeline displaying when DSHS received CPS complaints and other information regarding Fabregas. *See* Pltfs.' Reply (Dkt. # 51) at 4-6.

ORDER – 18

#### (d)     Payne Violated Plaintiff(s)' Rights.

Defendant Payne was a supervisor for CPS and the Department of Licensing Resources from 1998 to 2005, responsible for assigning incoming allegations of abuse and neglect for investigation.  Payne Decl. ¶¶ 2-3.  She was aware of numerous complaints against Fabregas, alleging abuse and neglect of Monica, Estera, and Ruth, from sources including other foster parents, school officials, neighbors, citizens, and anonymous referents.  She tagged some of these reports as having a "moderately high risk" of abuse or neglect.  *See*, *e.g.*, Payne Decl., Ex. E.  Despite her awareness of the number and volume of allegations against Fabregas, Payne believed that because the Plaintiffs denied the allegations, Fabregas's license could not be revoked.  *Id*. ¶ 57.  A reasonable person in Payne's position would have suspected that Fabregas posed a threat to Plaintiffs' safety.  Viewing this evidence in the light most favorable to Plaintiffs, Payne was deliberately indifferent to Plaintiffs' rights.

#### (e)     Lipson Violated Plaintiff(s)' Rights.

Defendant Lipson was the social worker for Ruth and Estera from June 2001 to January 2003.  Lipson Decl. ¶ 3.  During her time as their social worker, the court ordered that neither girl be moved from Fabregas's home "absent allegations of abuse/emergency, without the approval of the children through their attorney."  Erwin Decl., Ex. SS at 2.  Lipson admits that she "was aware of the numerous referrals of allegations of abuse by Fabregas towards the Tamas girls and [Monica] in the course of their placement [in] his home while I was the social worker."  Lipson Decl. ¶ 27.  Despite the court's authorization to remove Estera and Ruth upon allegations of abuse, Lipson did not do so because they denied the abuse occurred and there was no corroborating evidence.  *Id.*  A reasonable person in Lipson's position would have suspected that Fabregas posed a threat to Plaintiffs' safety.  Viewing the evidence in the light most favorable to Plaintiffs, Lipson was deliberately indifferent to Plaintiffs' rights.

ORDER – 19

### (f)     Kairoff Violated Plaintiff(s)' Rights.

Defendant Kairoff was Estera and Ruth's social worker from January to July 2003, and from May to August 2004.  Kairoff Decl. ¶ 3.  While Kairoff was assigned to the case, Ruth alleged that she had seen a videotape of Fabregas sexually abusing Estera, and Ruth's foster parent claimed that she was convinced that Ruth's allegations were true.  *Id.* ¶¶ 8-9.  Kairoff met with Estera, who denied the abuse.  *Id.* ¶ 11.  Kairoff claims he lacked evidence of abuse to support removing Estera or Monica from Fabregas other than Ruth's statement and the letter of support from Ruth's foster parent.  *Id.* ¶ 14.  Kairoff also notes that *the court* did not change Estera's placement because Estera denied abuse and there was no corroborating physical evidence of abuse (like the videotape itself or an eyewitness).  *Id.* ¶ 11.  During this time, Kairoff had authority from the court to remove Estera from Fabregas's home upon allegations of abuse or emergency, but he did not do so.  A reasonable person in Kairoff's position would have suspected that Fabregas posed a threat to Plaintiffs' safety.  Viewing the evidence in the light most favorable to Plaintiffs, Kairoff was deliberately indifferent to Plaintiffs' rights.

### (g)     Baker Violated Plaintiff(s)' Rights.

Defendant Baker investigated the multiple CPS complaints filed against Fabregas in 2004, and determined that they were either unfounded or inconclusive.  *See* Baker Decl. ¶¶ 17 and 39.  She was also aware of the previous complaints filed against Fabregas.  *Id.* ¶ 40.  Despite her knowledge of these complaints, Baker did not exercise her professional discretion to protect Plaintiffs.  During the time that Baker was investigating the complaints against Fabregas, Estera and Monica were briefly removed from Fabregas's home and then returned days later.  A reasonable person in Baker's position would have suspected that Fabregas posed a threat to Plaintiffs' safety.  Viewing the evidence in the light most favorable to Plaintiffs, Baker was deliberately indifferent to Plaintiffs' rights.

ORDER – 20

As detailed in this section, the evidence viewed in the light most favorable to Plaintiffs shows that the individual Defendants were aware of facts that would have led reasonable people in their position to know or suspect that Fabregas was abusing Plaintiff(s). The individual Defendants nonetheless allowed Plaintiffs to remain in Fabregas's care for years and licensed and re-licensed Fabregas as a foster parent. A reasonable person in the position of each individual Defendant would have known that his or her conduct violated the Plaintiffs' constitutional right to safety, and the court therefore concludes that the individual Defendants are not entitled to qualified immunity.

**B.    The Court Strikes Two of Defendants' Affirmative Defenses.**

**1.    Legal Standards on a Motion to Strike Affirmative Defenses.**

A motion to strike material in an answer seeks to eliminate "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The court exercises discretion in ruling on a motion to strike. *Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990). Granting a motion to strike an affirmative defense is appropriate if the affirmative defense is legally insufficient on its face and if there is no set of circumstances under which the defense could succeed. *See Hart v. Baca*, 204 F.R.D. 456, 457 (C.D. Cal. 2001).

**2.    The Court Grants Plaintiffs' Motion as to the Jurisdiction[9] and Failure to State Claim Defenses.[10]**

---

[9]Defendants have conceded that the jurisdiction defense should be stricken. They do not address Plaintiffs' request to strike the jurisdiction defense in their opposition brief, and their proposed order attached grants Plaintiffs' motion as to the jurisdiction defense. *See* Defs.' Opp'n (Dkt. ## 36, 36-2).

[10]Plaintiffs' motion also asks the court to strike the immunity-related defenses. As evidenced by the court's analysis of immunity in an earlier section of this order (*see supra*, Section III.A.2), the immunity-related defenses are not legally insufficient on their face. Therefore, the court DENIES Plaintiffs' motion to strike to the extent it requests that the Defendants' immunity-related defenses (those listed in Answer ¶¶ 3, 4, 6) be stricken.

Defendants have raised an affirmative defense based on Plaintiffs' failure to state a claim, alleging that Plaintiffs failed to properly plead Section 1983 claims because the individual Defendants were sued in their official capacities.

A plaintiff may bring a claim under Section 1983 to redress violations of his or her "rights, privileges, or immunities secured by the Constitution or [federal] laws" by a person acting under the color of state law. 42 U.S.C. § 1983; *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). For purposes of Section 1983, "neither a State nor its officials acting in their official capacities are 'persons.'" *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). However, state officials "sued in their individual capacities [] are 'persons' within the meaning of Section 1983." *Hafer v. Melo*, 502 U.S. 21, 31 (1991). In a case where a complaint does not specify the capacity in which a claim is brought, "[t]he course of proceedings in such cases typically will indicate the nature of the liability sought to be imposed." *Brandon v. Holt*, 469 U.S. 464, 469 (1985).

In this case, the course of proceedings reasonably indicates that Plaintiffs' Section 1983 claims were brought against the individual Defendants in their individual capacities. The complaint alleges that each individual Defendant's actions or omissions violated the Plaintiffs' constitutional rights. The complaint seeks punitive damages against each individual Defendant, and punitive damages are only available against an individual in his or her individual capacity. *See Larez v. City of Los Angeles*, 946 F.2d 630, 640 (9th Cir. 1991). The Defendants' answer raises a qualified immunity defense, which is only available in a case where a defendant is sued in his or her individual capacity. *Id.* Because it is reasonably clear from the course of proceedings that the individual Defendants were sued under Section 1983 in their individual capacities, the Defendants'

affirmative defense based on a failure to state a claim lacks merit and should be stricken.[11]

### 3.    Three of Defendants' Affirmative Defenses are Not Clearly Insufficient.

In three of their affirmative defenses, Defendants contend that third-party law enforcement agencies were the proximate cause of Plaintiffs' injuries, that Plaintiffs failed to mitigate their damages, and that Defendants are entitled to an offset for any awards paid to Plaintiffs in connection with the alleged damages. *See* Answer ¶¶ 5, 7, 8. Plaintiffs moved to strike these affirmative defenses on the grounds that Defendants have provided no factual or legal support that these defenses are applicable. *See* Pltfs.' Mot. (Dkt. # 78).

This argument demonstrates a misunderstanding of a plaintiff's burden on a motion to strike affirmative defenses. To prevail on a motion to strike an insufficient defense, the plaintiff must show that there are no disputed issues of fact or law, and that there is no set of circumstances under which the defense could succeed. *See S.E.C. v. Sands*, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995).

It may be true that at this stage, before the close of discovery, Defendants have not produced documents supporting a factual basis for at least some of these affirmative defenses. But Plaintiffs have failed to show that there is no set of circumstances under which the defenses could succeed, so granting the motion to strike would be improper at this stage in the proceeding. The court denies Plaintiffs' motion to strike these affirmative defenses.

_____

[11]This argument is also one ground on which Defendants moved for summary judgment (*see* Defs.' Mot. (Dkt. # 36) at 29). Because the defense is stricken for the reasons explained in this section, the court thereby DENIES Defendants' motion for summary judgment to the extent it is based on a contention that Plaintiffs failed to state a claim.

ORDER – 23

**IV. CONCLUSION**

For the reasons explained above, the court GRANTS IN PART and DENIES IN PART Plaintiffs' first motion to strike (Dkt. # 27) and DENIES Plaintiffs' second motion to strike (Dkt. # 78). The court DENIES Defendants' summary judgment motion (Dkt. # 36). Plaintiffs' motions to strike (Dkt. ## 58 and 67) are DENIED, and Defendants' motion to strike (Dkt. # 36) is DENIED. The parties are directed to submit a joint status report no later than October 24, 2008, and the court will issue a minute order rescheduling the trial date and related dates upon review of that report.

Dated this 19th day of September, 2008.

_Richard A. Jones_
The Honorable Richard A. Jones
United States District Judge

ORDER – 24