### FOR PUBLICATION

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Estera L. Tamas; Ruth S. Tamas; Monica, by and through her court-appointed guardian for purposes of litigation,

*Plaintiffs-Appellees,*

v.

Department of Social & Health Services, State of Washington; Marschell Baker, individually and in her official capacity acting under the color of state law; Joyce Drake individually and in her official capacity acting under the color of state law; James Kairoff, individually and in his official capacity acting under the color of state law; Sharon Kleinhen, individually and in her official capacity acting under the color of state law; Chris Kneser individually and in her official capacity acting under the color of state law; Elaine Lipson, individually and in her official capacity acting under the color of state law;

20527

Sharon Loeffler, individually and
in her official capacity acting
under the color of state law;
Beverly Payne individually and in
her official capacity acting under
the color of state law; Kellie
Walker, individually and in her
official capacity acting under the
color of state law,
                    Defendants-Appellants.

No. 08-35862
D.C. No.
2:07-cv-00750-RAJ
OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
October 15, 2009—Seattle, Washington

Filed December 22, 2010

Before: Johnnie B. Rawlinson and Consuelo M. Callahan,
Circuit Judges, and Larry A. Burns,* District Judge.

Opinion by Judge Rawlinson

---

*The Honorable Larry A. Burns, United States District Judge for the
Southern District of California, sitting by designation.

## COUNSEL

Defendants-Appellants State of Washington Department of
Health and Social Services, Marschell Baker, Joyce Drake,
James Kairoff, Sharon Kleinhen, Chris Kneser, Elaine Lipson,
Sharon Loeffler, Beverly Payne and Kellie Walker are repre-
sented by Robert M. McKenna, Attorney General, Michael P.
Lynch (argued), and Peter J. Helmberger, Assistant Attorneys
General, Olympia, Washington.

Plaintiffs-Appellees Estera L. Tamas, Ruth S. Tamas, and
Monica are represented by David P. Moody (argued),
Anthony D. Shapiro, Erin K. Flory, and Marty D. McLean,
Hagens Berman Sobol Shapiro LLP, Seattle, Washington.

## OPINION

RAWLINSON, Circuit Judge:

  Enrique Fabregas (Fabregas) is a predator who slithered
into the lives of vulnerable women with young daughters.

There is no question that Fabregas molested his foster daughters, one of whom he legally adopted. The more challenging question this case presents is whether the State of Washington Department of Social and Health Services (DSHS) and nine DSHS employees' involved in overseeing the foster care of Monica (Monica), Ruth Tamas (Ruth), and Estera Tamas (Estera) are legally responsible for the injuries inflicted by Fabregas.

Monica, Ruth, and Estera (Appellees) filed a lawsuit against DSHS and nine of its employees (Appellants) alleging negligence and civil rights violations under 42 U.S.C. § 1983. Appellants filed a summary judgment motion asserting that the individual DSHS employees were entitled to absolute and qualified immunity. Appellants challenge the district court's denial of their motion. Because the district court did not apply the correct standard in assessing whether qualified immunity applies, we vacate the district court's judgment and remand this case for application of the correct standard, and for separate analysis of each Appellant's prospective liability.

## I. BACKGROUND

Over the course of approximately ten years, DSHS received and responded to almost thirty formal and informal complaints regarding Fabregas' interaction with his foster children, Monica, Ruth and Estera.

On July 19, 1996, DSHS received a referral (Referral 1) alleging that Fabregas abused Monica's mother and used cocaine. DSHS subsequently filed a dependency petition regarding two-year-old Monica, which was granted. DSHS placed Monica with Pamela Deming (Deming).

Appellant Chris Kneser (Kneser) was Monica's DSHS social worker from June 2, 1997, to February 26, 1999. Deming reported to Kneser that she witnessed Fabregas "french kiss" Monica, suspected Monica was molested, and viewed a

Tamas v. DSHS

video made by Fabregas showing Monica in a freezer, standing unrestrained in a moving car, and standing by a busy freeway in a cow costume. On July 1, 1997, Kneser received a referral (Referral 2) reporting that Monica said she "told Papa to stop. No no no[,]" and pointed to her bottom when asked where he touched her. Kneser initiated a Child Protective Services (CPS) investigation, which "determined the allegation to be inconclusive" because Monica and Fabregas denied the abuse and Moore (Monica's mother) did not believe Fabregas abused Monica.

On November 25, 1997, Fabregas applied for a foster care license[1] and filed a motion for an order placing Monica with him.[2] On March 2, 1998, the court ordered Monica's placement with Fabregas, subject to conditions that he obtain a foster-care license and comply with DSHS's service plan.[3] Appellant Sharon Kleinhen (Kleinhen), a foster home licensor from 1975 to 1999, conducted a home study and reviewed Fabregas' license application. She noted the court's placement of Monica with Fabregas despite his criminal history, his "odd parenting methods, a drug and rehabilitation past, and concerns about sexual deviance[.]" Kleinhen nevertheless recommended to her supervisor, Appellant Joyce Drake (Drake), that Fabregas be licensed. Drake, the licensor supervisor from 1997 to 2002, signed the license, and dated it March 9, 1998.

In February, 1999, Fabregas requested a second license when he changed his residence. Fabregas once again misrepresented his criminal history on the application. Appellant

---

[1]Fabregas falsely declared on his foster-care license application that he had never been convicted of a felony. On May 6, 1998, Fabregas moved the court for a certificate of rehabilitation, which enabled him to be licensed regardless of his criminal history.

[2]Fabregas attached his extensive criminal history to his motion.

[3]On May 8, 1998, prior to DSHS issuing Fabregas' foster-care license, the King County Superior Court entered a permanency planning order placing Monica with Fabregas.

Sharon Loeffler, the foster home licensor on Fabregas' second license request, reviewed Kleinhen's remarks and Fabregas' 1998 criminal charge, interviewed Fabregas, and recommended approval to Drake. Drake signed the license on May 17, 1999.

From 1998 to 2005, Appellant Beverly Payne (Payne) was the supervisor of the Department of Licensing Resources and CPS. Payne reviewed and evaluated whether the referrals received in a CPS unit were properly screened and sent out for investigation. During Payne's supervisory period, DSHS received numerous referrals involving Fabregas.[4]

On December 1, 1999, DSHS received a referral (Referral 3) alleging that Fabregas left Monica alone with her alcoholic mother, failed to regularly take Monica to school or her speech therapy appointments, and failed to adequately feed Monica; and that Monica had bruises on her feet. DSHS interviewed Monica, Monica's teacher and Fabregas, all of whom either denied or negated the alleged complaints. DSHS concluded that the allegations were unfounded.

By 2000, Fabregas had legally adopted Monica. In June of that year, DSHS received a referral (Referral 4) alleging that 6-year-old Monica soiled her pants at school several times and accused Fabregas of having drugs. DSHS concluded that the "allegation did not meet the criteria for investigation" and that there was "no allegation about Mr. Fabregas."

On September 29, 2000, DSHS received a referral (Referral 5) regarding Monica. The referral also mentioned Ruth and Estera, the daughters of Fabregas' then girlfriend, Lydia. The referral alleged that Monica was left alone until midnight and

[4]A CPS referral addresses child abuse or neglect and investigations are concluded as either founded, unfounded, or inconclusive. A licensing referral addresses violations of regulations or policies and investigations are concluded as valid or invalid.

that Estera regularly left with Fabregas at approximately 10:00 p.m. dressed like a "hooker," returning about 5:00 a.m. DSHS closed the investigation after Monica, Ruth, and Estera denied the allegations and law enforcement expressed no interest in investigating.

DSHS received a March 5, 2001, referral (Referral 6) reporting Fabregas "kissing and holding" Monica as if she were a "girlfriend or lover." DSHS concluded that "the allegation did not meet the criteria for investigation" because there was "no allegation about Mr. Fabregas." Ten days later, DSHS received a referral (Referral 7) that Monica said a bruise on her face resulted from her dad biting her and school staff observed Fabregas "all over [Monica] physically all the time." After Monica told DSHS that the bruise was from wrestling and her dad liked "to hug and kiss everyone[,]" DSHS determined that the allegations were unfounded.

Appellant Elaine Lipson (Lipson), was Ruth and Estera's social worker from June 14, 2001, to January 27, 2003. During this period, DSHS received six referrals (Referrals 8 through 13) alleging Fabregas' abuse of Ruth and Estera. On June 1, 2001, DSHS filed dependency petitions for Ruth and Estera, who requested to be placed with Fabregas. Over the objections of DSHS and Lydia,[5] on July 31, 2001, the court ordered that Ruth and Estera be placed with Fabregas on the condition that he obtain a foster care license.

Fabregas applied for a third foster care license on July 23, 2001, and again failed to disclose his felony convictions. While Fabregas' license was pending, DSHS received a referral (Referral 8) that Ruth had bruising due to a fight with Monica. DSHS rendered a finding of "not valid for discipline" and "not valid for supervision" because Fabregas was not yet licensed.

---

[5]Lydia was facing criminal charges at the time.

On October 15, 2001, Lipson filed a declaration with the court to remove Ruth's placement from Fabregas' home after Ruth expressed a desire to no longer reside with Fabregas. Ruth changed her mind by the time of the hearing, however, and the Snohomish County Superior Court ordered that both Ruth and Estera remain with Fabregas, neither Ruth nor Estera be moved absent allegations of abuse or an emergency, and that a DSHS-approved comprehensive placement assessment be completed.[6]

On December 27, 2001, Fabregas renewed his application for a foster care license and again failed to disclose his felony convictions. While Fabregas was still unlicensed, DSHS received a referral (Referral 9) alleging that Fabregas provided Ruth and Estera with cigarettes and alcohol. Ruth, Estera and Fabregas denied the allegations and accused the referent of lying. Prior to the issuance of Fabregas' third license, Lydia[7] filed a motion to remove the girls from Fabregas' care. However, Ruth and Estera both requested to stay with Fabregas.

Appellant Kellie Walker (Walker), a DSHS foster home licensor from October, 2001, to December, 2002, was in charge of reviewing Fabregas' third license application. She interviewed Fabregas and "the girls", spoke to the police, and reviewed the October 8, 2001, and January 17, 2002, referrals. On March 20, 2002, Appellant Walker issued Fabregas' third license.

On July 31, 2002, DSHS received a referral (Referral 10) reporting that Fabregas pushed Estera against a wall causing her to bang her head, and slapped Ruth in the face with his shirt. DSHS concluded that the referral was unfounded

[6]Ellis Amdur conducted the assessment and recommended that Fabregas adopt both Ruth and Estera.

[7]Lydia changed her name from "Lydia Tamas" to "Diana Smith." For consistency, this opinion uses "Lydia."

because Ruth and Estera denied the allegations. On August 4, 2002, DSHS received a referral (Referral 11) reporting that Fabregas pinched Ruth and Estera's sister's breast, leaving a bruise. DSHS closed the referral as "information only". On September 25, 2002, DSHS received a referral (Referral 12) reporting that Fabregas encouraged Ruth and Estera to shoplift. DSHS closed the investigation because there was no allegation as to Fabregas' care. The following day, DSHS received a similar referral (Referral 13) regarding Fabregas' encouragement of the Tamas sisters' shoplifting, his acceptance of their drinking and his verbal abuse of the girls. DSHS interviewed Ruth, Estera, Ruth and Estera's sister, and Fabregas, all of whom denied the allegations. Thus, DSHS concluded that the allegations were unfounded.

James Kairoff (Kairoff) was Ruth and Estera's social worker from January, 2003, to July, 2003, and from May, 2004, to August, 2004. On August 12, 2003, DSHS granted Fabregas his fourth foster home license. On October 9, 2003, DSHS received a referral (Referral 14) that Monica's 12-year-old female neighbor kissed her and requested sex. On November 5, 2003, DSHS received a referral (Referral 15) that Monica stated she was tired because "she sleeps with her dad and he bumps into her in bed." DSHS concluded that the referrals did not allege abuse or neglect.

DSHS received a referral (Referral 16) on December 16, 2003. The referent described possessing a pornographic picture of Monica giving Fabregas a "blow job." DSHS dismissed the allegations as unfounded because the picture was of Monica's mother rather than Monica. In addition, Monica, Ruth, Estera and Fabregas all denied inappropriate touching. DSHS, however, forwarded the referral to the King County Sheriff's Office, which also concluded that the allegations were unfounded.

Appellant Marschell Baker (Baker) became a supervisor of the Department of Licensing Resources and CPS in 2004. On

April 7, 2004, DSHS received a referral (Referral 17) that Monica had bruising and gave conflicting stories on the origin of the bruises. DSHS concluded that the allegations were unfounded after Monica, Ruth, Estera and Fabregas all denied abuse and Dr. Kenneth Feldman was unable to conclude that the bruises resulted from abuse.

On May 6, 2004, Ruth requested to be removed from Fabregas' care. DSHS placed Ruth in the foster care of Mary Jean Smith (Smith). DSHS received a May 12, 2004, referral (Referral 18) reporting that Fabregas punished Ruth by yelling at her for up to two hours, grounding her, making her stand for hours, and requiring her to write passages up to 2,000 times. On May 17, 2004, DSHS received a referral (Referral 19) that Ruth found a pornographic video of Estera giving Fabregas a "blow job" and Fabregas inserting his fingers into Estera's vagina. Ruth allegedly copied the video and later destroyed it due to her fear of Fabregas and because of Fabregas' claim to having "mob connections." The referral also noted that Monica was "very sexualize[d]" and "makes out with [Ruth and Estera's sister's] face."

Baker forwarded the May 12th and May 17th referrals (Referrals 18 and 19) to the Kirkland Police Department and interviewed Monica, Ruth, Estera, Fabregas, Detective Jack Kessee, Ruth and Estera's sister, and Smith. Estera and Fabregas both stated that Ruth had a history of lying. Monica denied the allegations. Detective Kessee had investigated the case and concluded that there was no proof of a crime. However, Ruth and Estera's sister believed Ruth. DSHS again concluded that the sexual and physical abuse allegations were unfounded due to lack of conclusive evidence.

On May 20, 2004, DSHS received a referral (Referral 20) stating that Monica was "filthy from head to toe" and that Fabregas was "very shaky." DSHS concluded the referral was invalid. On May 26, 2004, DSHS received a referral (Referral 21) stating that Fabregas told Ruth she could not call his

home to talk to Estera. DSHS terminated the referral with an "inconclusive" determination.

Smith wrote DSHS a letter on May 31, 2004, detailing Ruth's statements to her regarding Fabregas' abuse of the girls. Throughout June and July 2004, Smith wrote letters to DSHS, Payne, Kairoff, and Baker complaining that "something needs to be done." Kairoff interviewed Estera, who denied Ruth's allegations.

On June 15, 2004, DSHS received a referral (Referral 22) alleging that in the prior year Fabregas beat Ruth in his car. DSHS concluded that the referral was not valid for discipline. On July 29, 2004, DSHS received three referrals (Referrals 23, 24, 25) alleging that Fabregas was preventing contact between Ruth and Estera and that Estera admitted the sexual abuse had occurred. In response, on July 30, 2004, the Kirkland police removed Estera and Monica from Fabregas' home. At the same time, DSHS concluded that the sexual abuse allegations were inconclusive.

On August 3, 2004, DSHS received a referral (Referral 26) reflecting that Estera admitted she and Fabregas were ingesting cocaine when the police removed her from Fabregas' home. Baker interviewed Estera the following day and Estera confirmed Ruth's allegations. Baker nevertheless concluded that the sexual abuse allegations were inconclusive because Fabregas' denials of abuse were believable and the Tamas girls had a history of recantations. Monica was returned to Fabregas' care.

DSHS did not renew Fabregas' foster license in October, 2004, because Fabregas refused to complete a sexual deviancy evaluation. On November 15, 2004, DSHS received a letter from Estera recanting her sexual abuse allegations and accusing Smith of bribing her with an offer to pay for braces if Estera said Fabregas gave her cocaine and raped her. On

August 12, 2005, the King County Prosecutor's Office declined prosecution.

On February 2, 2006, DSHS received a referral (Referral 27) alleging that Monica and Fabregas had matching rashes on their genitalia, that Monica had a bladder problem and anxiety attacks, and that Fabregas provided Ecstasy to Monica. Two weeks later, the Redmond Police Department obtained a search warrant to search Fabregas' home. Monica was escorted to CPS, Fabregas was arrested, and hundreds of pornographic photographs, movie clips, lingerie items, and dress-up props were seized.

On April 27, 2007, Monica, Ruth, and Estera, filed their complaint against Appellants asserting claims under 42 U.S.C. § 1983. Appellees specifically alleged that Appellants deprived them of their constitutional rights by "choo[sing] to license Fabregas to care for children in his home" and by not "acting appropriately to protect [Appellees]." After the case was removed to federal court, the district court denied Appellants' summary judgment motion predicated on their immunity from suit. Appellants filed a timely notice of appeal.

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo and construe all the evidence in the light most favorable to the non-moving party. *See Kraus v. Presidio Trust Facilities Division/Residential Management Branch*, 572 F.3d 1039, 1042 (9th Cir. 2009). Whether an Appellant is entitled to absolute immunity or qualified immunity is also reviewed de novo. *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009).

## III.  DISCUSSION

### A.  Absolute Immunity

[1] "Absolute immunity is generally accorded to judges and prosecutors functioning in their official capacities." *Olsen*

*v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). "[I]n determining absolute immunity, we examine the nature of the function performed, not the identity of the actor who performed it." *Tennison*, 570 F.3d at 1092 (citation, alteration and internal quotation marks omitted). Absolute immunity is extended to state officials, such as social workers, when they are performing quasi-prosecutorial and quasi-judicial functions. *See Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir. 1991) (naming advocacy to the decisionmaker and execution of a court order as examples). However, social workers are not afforded absolute immunity for their investigatory conduct, discretionary decisions or recommendations. *See Beltran v. Santa Clara County*, 514 F.3d 906, 908-09 (9th Cir. 2008); *see also Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003) (citing as examples decisions and recommendations regarding a particular foster home or foster parents).

   **[2]** The Appellants assert that they are entitled to absolute immunity because their placement of the three girls with Fabregas was pursuant to court order. However, Appellants' decisions to license Fabregas and to retain Monica, Ruth and Estera in Fabregas' care were not quasi-prosecutorial or quasi-judicial in nature. Appellants placed Monica, Ruth and Estera in Fabregas' care pursuant to court orders conditioned upon Appellants' licensing Fabregas as a foster parent. A court order further provided that Ruth and Estera could be removed from Fabregas' care if allegations of abuse or emergency existed. Therefore, in deciding to license Fabregas and not remove Monica, Ruth and Estera from Fabregas' home Appellants performed the traditional investigation and placement responsibilities assumed by social agencies. *See Miller*, 335 F.3d at 898. We therefore conclude that the Appellants were not entitled to absolute immunity. *See Beltran*, 514 F.3d at 908-09 (concluding that absolute immunity does not apply to social workers' "investigatory conduct").

### B.   Qualified Immunity

   **[3]** The determination of whether qualified immunity shields the Appellants from liability presents a closer and

more difficult question. In determining whether officials are entitled to qualified immunity, we inquire: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right and (2) if so, whether the right was clearly established, such that a reasonable official would understand that his conduct violated that right. *See Conn v. City of Reno*, 572 F.3d 1047, 1061 (9th Cir. 2009). We may apply the two-step analysis in any sequence we deem appropriate. *See id.*

### 1. Constitutional Right

**[4]** The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent. *See Carlo v. City of Chino*, 105 F.3d 493, 501 (9th Cir. 1997)*; see also Campbell v. Burt*, 141 F.3d 927, 931 n.2 (9th Cir. 1998). "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care . . ." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992) (citations omitted). Accordingly, Monica, Ruth and Estera held protected liberty interests in being shielded from harm inflicted by a foster parent and enjoyed a special relationship with the state once their dependency petitions were granted. *See Lipscomb*, 962 F.2d at 1379; *see also Carlo*, 105 F.3d at 501. Understandably, the law does not impose the duty of guarding their own safety on wards of the state. Rather, that duty is the quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population. Appellants argue that they did not interfere with Appellees' liberty interests because the girls were free to leave Fabregas' care upon request.[8] However, Appel-

---

[8]Appellees maintain that Appellants' failure to follow state law regarding reporting child abuse allegations to law enforcement supports their claims under § 1983. However, to state a claim under § 1983, a plaintiff must "allege the deprivation of a right secured by the *federal* Constitution or statutory law . . ." *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 572 F.3d 685, 692 (9th Cir. 2009) (emphasis added). Therefore, the alleged violations of state law are not relevant to our analysis. *See id.*

lants cannot escape liability by shifting the onus onto the
wards to request removal. In addition, years of abuse ham-
pered Appellees in their ability to ensure their own safety. See
Carlo, 105 F.3d at 501. For example, Estera believed that "ev-
erything that [she] went through [was] normal."

### a. Fabregas' Adoption of Monica

[5] A state official's duty to provide adequate care to a fos-
ter child generally terminates once the foster child is officially
adopted. *See Griffith v. Johnston*, 899 F.2d 1427, 1440 (5th
Cir. 1990).[9] This principle is consistent with the concept that
the state functions as the *de facto* parent of a child in foster
care. *See Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791,
795 (11th Cir. 1987) (en banc) ("The state's action in assum-
ing the responsibility of finding and keeping the [foster] child
in a safe environment placed an obligation on the state to
insure the continuing safety of that environment."). Once the
foster child is adopted, the adoptive parent assumes the role
of caregiver previously occupied by the state. It becomes the
adoptive parent's responsibility to provide for the well-being
of the adopted child, *see Griffith*, 899 F.2d at 1440, with no
further need for the state to oversee the welfare of the former
foster child.

[6] However, state actors may nevertheless incur liability
under § 1983 if state officials affirmatively created a danger
that the adopted child would not have otherwise faced. *See
L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). In *Grubbs*,
we held that the danger creation exception applied where state
correctional officers knowingly created an opportunity for a
convicted sex offender to assault the custodial institution's
nurse. *See id.* The officers in *Grubbs* "affirmatively created
the dangerous situation," *id.* at 122, because they assigned the
sex offender to work with the nurse despite knowing: (1) that

---

[9]There does not appear to be authority from the United States Supreme
Court or our circuit specifically addressing this point.

the sex offender "had an extraordinary history of unrepentant violence against women and girls;" (2) that the sex offender would "likely assault a female if left alone with her;" (3) that the nurse "would be alone with [the sex offender]"; and (4) that the nurse "would not be prepared to defend [herself]" because she was not "informed . . . that she would be left alone with violent offenders." *Id.* at 121. Similarly, prior to Fabregas' adoption of Monica, various Appellants affirmatively created the particular danger that exposed Monica to harm. Despite referrals reporting Fabregas' physical and sexual abuse, Kleinhein, Loeffler and Drake approved Fabregas' foster-care licenses, paving the way for Fabregas to continue abusing Monica after her adoption. The state's approval of Monica's foster care and adoption by Fabregas created a danger of molestation that Monica would not have faced had the state adequately protected her as a result of the referrals.

[7] Appellants cite *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 192 (1989) in support of their argument for immunity. In *DeShaney*, the state briefly took custody of a child from his birth father to investigate alleged abuse. *See id.* The Court concluded that "the State had no constitutional duty to protect [the child] against his father's violence" because "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* at 201, 202. By contrast, Monica, as a foster child, was in the custody of the state for three years prior to her adoption. Unlike the facts in *DeShaney*, where the victim was "in no worse a position than that in which he would have been had [the state] not acted at all," *DeShaney*, 489 U.S. at 201, Monica was placed in a worse situation by the actions and inactions of the various Appellants. Therefore, we conclude that Monica's liberty interest continued after her adoption under the danger-creation exception to the general rule that state actors are not liable for failure to protect members of the public.

### b.   Violation of Liberty Interest

[8] To violate due process, state officials must act with such deliberate indifference to the liberty interest that their actions "shock the conscience." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (citation omitted). Conduct that "shocks the conscience" is "deliberate indifference to a known or so obvious as to imply knowledge of, danger."[10] *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006) (citation and internal quotation marks omitted).

### c.   Objective and Subjective Inquiry

Appellants contend that "[a] substantive due process claim for deliberate indifference in a foster home placement requires examination of both objective and subjective components" and that neither component is met in this case.

[9] This court has only addressed the application of the deliberate indifference standard with respect to foster children in one case. *See Gibson v. Merced County Department of Human Resources*, 799 F.2d 582, 589-90 (9th Cir. 1986). In *Gibson*, we held that state officials were not deliberately indifferent to a foster child's liberty interest when they removed the child from uncooperative foster parents who were attempting to prevent the child's reunification with her natural mother. *See id.* Although we did not discuss the deliberate indifference standard in *Gibson,* we have addressed that standard at length in resolving cases involving prisoners alleging deliberate indifference. In the prisoner cases we have held that deliberate indifference "requires an objective risk of harm and a subjective awareness of that harm." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *as amended* (cita-

---

[10]Citing *Hearns v. Terhune,* 413 F.3d 1036 (9th Cir. 2005), Appellees argue that deliberate indifference includes gross negligence. However, in *Kennedy*, we explicitly held that the deliberate indifference standard is "not gross negligence." *Kennedy*, 439 F.3d at 1064.

tion and emphasis omitted); *see also, Simmons v. Navajo County*, No. 08-15522, 2010 WL 2509181, at *4 (9th Cir. June 23, 2010) (concluding that "[a] prison official cannot be liable for deliberate indifference unless he or she knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference") (citation and internal quotation marks omitted); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010) (recognizing that the objective component requires a showing of "a substantial risk of serious harm" and the subjective component requires a showing that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he . . . also dr[e]w the inference"). These cases inform our analysis and our review of precedent from our sister circuits.

In the specific context of cases involving foster care, the Fifth, Sixth, and Eighth Circuits have held that deliberate indifference is established if an "official [was] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and [the official] . . . also dr[e]w the inference." *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004) (citation omitted); *Arledge v. Franklin County, Ohio*, 509 F.3d 258, 261, 263 (6th Cir. 2007) (same); *James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006) (same). This analysis is identical to the subjective deliberate indifference component that we have articulated in prisoner cases and includes by implication the objective component requiring the existence of a substantial risk of serious harm.

The Second, Third, Fourth, Seventh, Tenth, and Eleventh Circuits have each phrased the deliberate indifference test along the same lines. *See Doe v. New York City Dep't of Social Services*, 649 F.2d 134, 145 (2d Cir. 1981) (explaining that deliberate indifference "cannot exist absent some knowl-

edge triggering an affirmative duty to act . . ."); *Nicini v. Morra*, 212 F.3d 798, 811-12 (3d Cir. 2000) (defining deliberate indifference as "conduct [that] shocks the conscience" while assuming that the "should have known" standard applies); *White by White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) (including a requirement that state officials "were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice"); *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 792 (7th Cir. 2003) (requiring subjective actual knowledge or suspicion of the risk); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1246 (10th Cir. 2003) (holding that state actors may be liable for placing children in a foster home "they know or suspect to be dangerous to the children . . .) (citation omitted); *H.A.L. ex rel. Lewis v. Foltz*, 551 F.3d 1227, 1231-32 (11th Cir. 2008) (assigning liability if the official was "deliberately indifferent to a known and substantial risk to the child of serious harm").

[10] We are persuaded by our precedent and cases from other circuits analyzing the issue, that the deliberate indifference standard, as applied to foster children, requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference. *See Clouthier*, 591 F.3d at 1242; *see also Conn*, 591 F.3d at 1095-96; *Arledge*, 509 F.3d at 263; *James*, 458 F.3d at 730; *Hernandez*, 380 F.3d at 881. We also conclude that the subjective component may be inferred "from the fact that the risk of harm is obvious." *Hernandez*, 380 F.3d at 881 (citation and emphasis omitted); *Arledge*, 509 F.3d at 263.

[11] The district court ruled that the Appellants were deliberately indifferent because they "were aware of facts that would have led reasonable people in their position to know or suspect that Fabregas was abusing [Appellees]." However, the

district court did not analyze whether there was an objectively substantial risk of serious harm and whether Appellants actually drew the inference that a substantial risk of serious harm to Appellees existed or that a reasonable official would have been compelled to draw that inference. Failure to apply the correct standard constituted reversible error. *See Ellis v. City of San Diego*, 176 F.3d 1183, 1186 (9th Cir. 1999), *as amended*.

## 2. Clearly Established Right

**[12]** The second prong required to defeat qualified immunity is a showing that the Appellees' constitutional rights were clearly established. *See Conn*, 572 F.3d at 1062. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 1062. This inquiry is "wholly objective." *Brittain*, 451 F.3d at 988.

**[13]** Appellants contend that the law was not clearly established that foster children had a federal constitutional right to state protection, citing *Doe v. South Carolina Department of Social Services*, 597 F.3d 163, 176 (4th Cir. 2010). The Fourth Circuit in *Doe* held that its precedent did not clearly establish such a right because its prior cases did not involve foster children within the custody and control of the state when the state made foster care placement decisions. *See Doe*, 597 F.3d at 173-77. However, unlike the Fourth Circuit, we previously held in 1992 that "[o]nce the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb*, 962 F.2d at 1379.

**[14]** We may also look to the law of other circuits to determine if a principle is clearly established. *See Prison Legal News v. Lehman*, 397 F.3d 692, 701-02 (9th Cir. 2005). As

TAMAS V. DSHS

early as 1981, the Second Circuit recognized that a state agency could be liable for deliberate indifference to a foster child's right to adequate supervision. *See Doe v. New York City Department of Social Services*, 649 F.2d 134, 141-42 (2d Cir. 1981). Subsequently, in 1987, the Eleventh Circuit held that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." *Taylor ex rel. Walker*, 818 F.2d at 797. In 1990, the Sixth Circuit held that "due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes." *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir. 1990). In the same year, the Seventh Circuit also concluded that foster children's right to state protection was clearly established because "*Youngberg* made the basic duty of the state to children in state custody clear . . ." *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990). In 1992, the Tenth Circuit concluded that foster children have a "clearly established right to protection while in foster care." *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992). One year later, the Eighth Circuit held that "it was clearly established in 1991 that the state had an obligation to provide adequate medical care, protection and supervision [to foster children]." *Norfleet ex rel. Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993). In 2000, the Third Circuit held that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties. The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983." *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000) (en banc).

**[15]** Based on these cases, we conclude that it was clearly established in 1996 that Appellees had a protected liberty

interest in safe foster care placement once they became wards of the state.

### 3.  Individual Appellants

**[16]** Because the district court analyzed whether the Appellants were deliberately indifferent under an erroneous standard, we remand for the district court to analyze each Appellant's prospective liability individually, utilizing the proper standard. The Appellants' potential liability varies, depending on whether each Appellant was aware of facts from which an inference could be drawn that a substantial risk of serious harm to Appellees existed, and upon whether each Appellant *actually drew* that inference.

At a minimum, the court should consider the following facts:

Kneser was aware of three graphic allegations regarding Fabregas — Fabregas' abuse of Monica's mother and drugs (Referral 1), Fabregas' "french kiss[ing]" of Monica, and Monica's report of telling "Papa to stop" while pointing at her bottom (Referral 2). Kleinhen, Loeffler, and Drake approved Fabregas's foster home licenses, despite their awareness of the two referrals and of a complaint regarding Fabregas' physical abuse of Monica's mother, drug abuse, and sexual abuse of Monica. Likewise, Walker approved Fabregas' third license despite knowledge of the escalating referrals alleging Fabregas' abuse of all three girls. Over the course of six years, Payne reviewed and evaluated nine CPS referrals regarding Fabregas' physical and sexual abuse of Monica, Ruth and Estera. During Lipson's employ at DSHS, DSHS received Referrals 8 through 13 and Lipson had the authority to recommend Ruth and Estera's removal pursuant to court order, but failed to do so. During Kairoff's tenure, DSHS received a referral that Monica and Fabregas were actually sleeping together and she was tired because Fabregas "bump[ed] into her in bed." Finally, in 2004, Baker received per-

haps the most serious CPS referrals, including a pornographic video involving Fabregas and Estera, and Estera's admission that the sexual allegations were true and that she used cocaine with Fabregas.

We express no view as to the outcome of the individualized qualified immunity inquiries to be conducted on remand.

## IV.  CONCLUSION

We vacate the district court's decision and remand this case to the district court to apply the correct deliberate indifference standard to analysis of the prospective liability of each Appellant.

**VACATED AND REMANDED.**